**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MAGHAR UBHI, Derivatively on Behalf of Nominal Defendant HUT 8 CORP.,<br><br>Plaintiff,<br><br>v.<br><br>JAIME LEVERTON, SHENIF VISRAM, BILL TAI, MIKE HO, ASHER GENOOT, ALEXIA HEFTI, JOE FLINN, MAYO A. SHATTUCK, III, STANLEY O'NEAL, AMY WILKINSON, and RICK RICKERTSEN<br><br>Defendants,<br><br>and<br><br>HUT 8 CORP.,<br><br>Nominal Defendant. | Case No.<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |

By and through the undersigned counsel, Plaintiff Maghar Ubhi ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant Hut 8 Corp. ("Hut 8" or the "Company") and against certain current and former officers and directors of the Company for: (i) violations of §10(b) and/or 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder; (ii) breaches of fiduciary duties; (iii) unjust enrichment; and (iv) waste of corporate assets. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by Hut 8 and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the

Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on Hut 8's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with, and publicly available from, the related consolidated securities fraud class action lawsuit captioned *Mayiras v. Hut 8 Corp., at al.*, Case No. 1:24-cv-00904 (S.D.N.Y.) (the "Related Securities Action"); and (e) review of other publicly-available information concerning Hut 8 and the Defendants.

## I. NATURE OF THE ACTION

1. Plaintiff brings this action derivatively for the benefit of Nominal Defendant Hut 8 against certain of the Company's current and/or former executive officers and directors aiming to rectify the Defendants' violations of the Exchange Act and breaches of fiduciary duties for issuing false and misleading statements and/or omitting material information in the Company's public filings and proxy statements from November 9, 2023 to the present (the "Relevant Period").[1]

2. Hut 8 is a crypto currency and data mining company, engaged in Bitcoin mining and hosting, managed services, energy arbitrage, and operating traditional data centers. The Company operates computing infrastructure which mines Bitcoin and delivers computing services to enterprise customers.

3. Hut 8 formed following the merger of Hut 8 Mining Corp. ("Legacy Hut") and U.S. Data Mining Group, Inc. d/b/a US Bitcoin Corp. ("USBTC") in November 2023 (the "Merger"). Shareholders of Legacy Hut received, for each share held, 0.2 shares of Hut 8 common stock. Stockholders of USBTC received, for each share of USBTC capital stock, 0.6716 shares of Hut 8 common stock. USBTC held a 50% interest in a joint venture bitcoin mining facility, located in

[1] The materially misleading statements and/or omissions were issued in the Company's financial reports and other public filings and releases from November 9, 2023 to January 18, 2024, however, the wrongs complained of herein continue through to the present as the Company's internal controls remain deficient.

King Mountain, Texas (the "King Mountain JV"), which was acquired in the Merger.

4. On January 18, 2024, J Capital Research published a report alleging, *inter alia*, that Hut 8's merger with USBTC was premised on a number of alleged misstatements, including (1) that the USBTC had an "undisclosed related party" as one of its largest shareholders, (2) that one of USBTC's core assets, the King Mountain JV, "has historically failed to provide energy and high-speed internet," and (3) that the Company had misstated certain finances of the King Mountain JV by failing to account for certain interest expenses. The report cited individuals that were "highly familiar" with USBTC, stating that without the Merger, USBTC would have undergone bankruptcy and that USBTC had a value estimated to be 70% less than the approximately $745 million that Hut 8 paid to acquire it.

5. Following release of this news, the Company's stock price fell $2.16, or 23.3%, to close at $7.12 per share on January 18, 2024, on unusually heavy trading volume.

6. Throughout the Relevant Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that one of USBTC's largest shareholders is an undisclosed related party; (2) that USBTC's core asset has historically failed to provide energy and high-speed internet; (3) that the profitability of certain USBTC assets were overstated; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

7. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and the Company have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

8. This Court has jurisdiction over this action pursuant to the subject matter of this action pursuant to 28 U.S.C. § 1331 because the claims arise under and pursuant to §10(b) of the Exchange Act and Rule 10(b)-5 promulgated thereunder.

9. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a), as they relate to Plaintiff's claims under 15 U.S.C. §78n(a).

10. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), because a substantial portion of the transactions and wrongs complained of herein occurred in this District and defendants have received substantial compensation within this District by doing business here and engaging in numerous activities that had an effect in this jurisdiction.

## III. THE PARTIES

### A. Plaintiff

11. Plaintiff has been a shareholder during the Relevant Period and has continuously held shares of Hut 8 common stock to present.

### B. Nominal Defendant

12. Nominal Defendant Hut 8 is incorporated in Delaware and its current principal executive offices are located at 1101 Brickell Avenue, Suite 1500, Miami, Florida 33131. The Company's common stock trades on the NASDAQ under the symbol "HUT."

### C. Defendants

13. Defendant Jaime Leverton ("Leverton") was the Company's Chief Executive Officer ("CEO") until her termination in February 2024. In addition, Defendant Leverton was a member of the Company's Board from November 2023 until her termination in February 2024. Defendant Leverton is named as a defendant in the Related Securities Action.

14. Defendant Shenif Visram ("Visram") is and has been the Company's Chief Financial Officer ("CFO") at all relevant times. Defendant Visram is named as a defendant in the Related Securities Action.

15. Defendants Leverton and Visram are collectively referred to herein as the "Securities Action Defendants."

16. Defendant Bill Tai ("Tai") is and has been the Chairman of the Board and a member of the Board since November 2023. Defendant Tai also serves as a member of the Board's Nominating, Environmental, Social and Governance Committee.

17. Defendant Mike Ho ("Ho") is and has been a member of the Company's Board since November 2023. Defendant Ho also serves as the Company's Chief Strategy Officer ("CSO") at all relevant times. Prior to joining the Company, Defendant Ho co-founded and served as USBTC's CEO and served as USBTC's board chair.

18. Defendant Asher Genoot ("Genoot") is and has been a member of the Company's Board since November 2023. Defendant Genoot has also served as the Company's CEO since February 6, 2024 and has served as the Company's President at all relevant times.

19. Defendant Alexia Hefti ("Hefti") is and has been a member of the Company's Board since November 2023. Defendant Hefti also serves as a member of the Board's Nominating, Environmental, Social and Governance Committee.

20. Defendant Joe Flinn ("Flinn") is and has been a member of the Company's Board since November 2023. Defendant Flinn also serves as the Chair of the Boards Audit Committee.

21. Defendant Mayo A. Shattuck, III ("Shattuck") is and has been a member of the Company's Board since November 2023. Prior to joining Hut 8, Defendant Shattuck served in a leadership role with USBTC for "Web 3.0." Defendant Shattuck also serves as Chair of the Board's

Compensation and Talent Development Committee.

22. Defendant Stanley O'Neal ("O'Neal") is and has been a member of the Company's Board since November 2023. Defendant O'Neal previously served as a director of USBTC. Defendant O'Neal serves as a member of the Board's Audit Committee.

23. Defendant Amy Wilkinson ("Wilkinson") is and has been a member of the Company's Board since November 2023. Defendant Wilkinson previously served as a director of USBTC. Defendant Wilkinson serves as a member of the Board's Audit Committee.

24. Defendant Rick Rickertsen ("Rickertsen") is and has been a member of the Company's Board since November 2023. Defendant Rickertsen serves as a member of the Board's Compensation and Talent Development Committee.

25. Defendants Tai, Ho, Genoot, Hefti, Flinn, Shattuck, O'Neal, Wilkinson, and Rickertsen are collectively referred to herein as the "Director Defendants."

26. The Director Defendants, along with the Securities Action Defendants. are collectively referred to herein as the "Individual Defendants."

27. Defendant Hut 8, along with the Individual Defendants are referred to herein collectively as the "Defendants."

## IV. FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

28. By reason of their positions as officers, directors, and/or fiduciaries of Hut 8, and because of their ability to control the business and corporate affairs of Hut 8, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Hut 8 in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of Hut 8 and its shareholders so as to

benefit all shareholders equally and not in furtherance of their personal interest or benefit.

29. Each director and officer of the Company owes to Hut 8 and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

30. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

**Duties of the Members of the Audit Committee**

31. Pursuant to the Audit Committee Charter[2] of Hut 8, the purpose of the Audit Committee is to:

assist the Board in its oversight of:

- the quality and integrity of the Company's financial statements and related information, including the Company's accounting and financial reporting processes and the audit of the Company's financial statements;
- the independence, qualifications, appointment and performance of the Company's external auditor (the "external auditor");
- the Company's disclosure controls and procedures, internal control over financial reporting, and management's responsibility for assessing and reporting on the effectiveness of such controls;
- the organization and performance of the Company's internal audit function;
- the Company's compliance with applicable legal and regulatory requirements; and
- the Company's enterprise risk management processes.

[2] Available at https://hut8.com/wp-content/uploads/2023/11/Audit-Committee-Charter.pdf.

32. Specifically, the Audit Committee has the following responsibilities, among others, with respect to the Company's financial reporting:

***Financial Reporting***

- Prepare an audit committee report to be included in the Company's annual proxy circular.

- Prior to their public disclosure, review and discuss with management and, if applicable, the external auditor or the internal auditor:

  i. the Company's annual financial statements and the related MD&A, including the discussion of critical accounting estimates under the Generally Accepted Accounting Principles ("GAAP") included therein and, if appropriate, recommend to the Board the approval, filing and disclosure of such information;

  ii. the Company's annual earnings press releases, including any pro forma or non- GAAP information included therein;

  iii. the Company's quarterly unaudited financial statements and associated MD&A, including the discussion of critical accounting estimates included therein;

  iv. the Company's quarterly earnings press releases, including any pro forma or non-GAAP information included therein;

  v. the type and presentation of financial information and earnings guidance provided to analysts, ratings agencies and others;

  vi. to the extent they include financial information extracted or derived from the Company's financial statements, other public reports or filings by the Company, including the Company's annual report on Form 10-K and proxy circular;

  vii. internal controls (or summaries thereof) and the integrity of the financial reporting and related attestations by the external auditor of the Company's internal control over financial reporting;

  viii. any significant difficulties encountered during the course of the audit, including, but not limited to, any restrictions on the scope of work or access to required information; and

ix. the Company's guidelines and policies governing the process of risk assessment and risk management.

33. In addition, the Audit Committee has the following responsibilities, among others, with respect to the Company's Internal Control and Procedures:

***Financial Reporting Processes, Accounting Policies and Internal Controls***

- Review and discuss with management and the external auditor and internal auditor, and monitor, report and where appropriate, provide recommendations to the Board on:

  i. the adequacy and effectiveness of the Company's system of internal control over financial reporting, including any significant deficiencies and significant changes in internal controls;

  ii. the integrity of the Company's external financial reporting processes;

  iii. the Company's disclosure controls and procedures, including any significant deficiencies in or material non-compliance with, such controls and procedures; and

  iv. the relationship of the Committee with other committees of the Board and management.

- Understand the scope of the external auditors' review of internal control over financial reporting and obtain reports on significant findings and recommendations, together with management responses.

- Review and discuss with the Company's Chief Executive Officer (the "CEO") and CFO the process for the certifications to be provided and receive and review any disclosure from the CEO and CFO made in connection with the required certifications of the Company's quarterly and annual reports filed, including: (i) any significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize, and report financial data; and (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls.

- Review major issues and analyses prepared by management or the external auditor or internal auditor regarding accounting principles and financial reporting issues and judgments made in connection with the preparation of

financial statements, including any significant changes in the Company's selection or application of accounting principles, the effect of non-GAAP methods on the financial statements, complex or unusual transactions and highly judgmental areas, such as the presentation and impact of significant risks and uncertainties and key estimates and judgments of management that may be material to financial reporting, the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company, major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies.

- Review and discuss with the independent auditors (outside of the presence of management) how the independent auditors plan to handle their responsibilities under the Private Securities Litigation Reform Act of 1995, and request assurance from the independent auditors that Section 10A(b) of the Exchange Act has not been implicated.

- Discuss with the independent auditors those matters brought to the attention of the Committee by the independent auditors pursuant to Auditing Standard No. 1301, Communications with Audit Committees, as amended ("AS 1301").

- Based on the Committee's review and discussions (1) with management of the audited financial statements, (2) with the independent auditors of the matters required to be discussed by AS 1301, and (3) with the independent auditors concerning the independent auditor's independence, the Committee shall make a recommendation to the Board as to whether the Company's audited financial statements should be included in the Company's Annual Report on Form 10-K for the last fiscal year.

- Review and discuss with the independent auditors the report required to be delivered by such auditors pursuant to Section 10A(k) of the Exchange Act.

- Approve transactions between the Company and its officers, directors, principal shareholders and affiliates, in accordance with the terms of the Company's Code of Business Conduct and Ethics and Related Person Transactions Policy.

- Review the Company's policies and procedures for reviewing and approving or ratifying related-party transactions as set forth in the Related Person Transactions Policy.

- Review the Company's policies and procedures for monitoring compliance with the Code of Business Conduct and Ethics.

- Review the Company's procedures for reviewing reports of whistleblowing

as set forth in the Whistleblower Policy.

- Review any reports of whistleblowing, including all reports made to the Company’s anonymous and confidential helpline, with the Company’s counsel in accordance with the Whistleblower Policy.

- Establish and oversee procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, including procedures for confidential, anonymous submissions by employees regarding questionable accounting or auditing matters.

- Meet periodically with management in the absence of the external auditor.

- Consider the risk of management’s ability to override the Company’s internal controls.

- At least annually, review, with the Company’s legal counsel and accountants, all legal, tax, or regulatory matters that could have a significant impact on the Company’s financial statements. Review the effectiveness of the system for monitoring compliance with laws and regulations and the results of management’s investigation and follow-up of any instances of non-compliance. Receive and review periodic reports from the Company with respect to the Company’s pending or threatened material litigation. Review the appropriateness of the disclosure thereof in the documents reviewed by the Committee.

- Discuss the Company’s policies with respect to risk assessment and risk management, including cybersecurity, the Company’s insurance and fidelity bond coverage, as well as the Company’s major financial risk exposures, the steps management has undertaken to control them, and any reports of the internal auditor concerning such matters.

- Review the Company’s compliance with internal policies and the Company’s progress in remedying any material deficiencies that could have a significant impact on the Company.

- Review the findings of any examinations by regulatory agencies, and any external auditors observations made regarding those findings.

- Review the internal accounting department’s budget and staffing.

- Establish systems for the regular reporting to the Committee by each of the Company’s management, external auditors and internal accounting department of any significant judgments made by management in the preparation of the financial statements and the opinions of each as to

appropriateness of such judgments.

34. Upon information and belief, the Company maintained versions of the Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

**Duties Pursuant to the Code of Business Conduct and Ethics**

35. The Individual Defendants, as officers and/or directors of Hut 8 were also bound by the Company's Code of Business Conduct and Ethics (the "Code").[3] The purpose of the Code is to set "basic requirements for business conduct and serves as a foundation for Company policies, procedures and guidelines, all of which provide additional guidance on expected behaviors.

36. Regarding conflicts of interest, the Code states that:

> Avoid all conflicts of interest by always putting the Company's interests first. Each Covered Person shall ensure that their judgment and ability to make decisions is not compromised and shall never use their position at the Company to serve personal interests or relationships.
>
> Conflicts of interest arise whenever actions are based on interests other than those of the Company. All Covered Persons are required to avoid any personal activity, investment or association that may interfere with the Company's best interests.
>
> * * *
>
> ***Financial Conflicts of Interest***
>
> A financial conflict of interest is one where there is or appears to be opportunity for personal financial gain, financial gain to close relatives or close friends, or where it might be reasonable for another party to take the view that financial benefits might affect that person's actions.
>
> Financial benefits means anything of monetary value, for example:
>
> i. payments for services;

---

[3] Available at https://hut8.com/wp-content/uploads/2023/11/Code-of-Business-Conduct-and-Ethics.pdf.

ii. equity interests (e.g. stocks, stock options or other ownership interests); or

iii. intellectual property rights (e.g. patents, copyrights and royalties from such rights).

The level of financial interest is not the determining factor as to whether a conflict should be disclosed. What might be 'not material' or 'not significant' for one person might be very significant for another. Good practice in many situations will mean the disclosure of any financial interest, however small.

***Non-financial Conflicts of Interest***

Non-financial interests can also come into conflict, or be perceived to come into conflict, with a person’s obligations or commitments to the Company. Such non-financial interests may include any benefit or advantage, including, but not limited to, direct or indirect career advancement, education or gain to immediate family.

37. Regarding accurate records and reporting, the Code states that:

***Ensure Financial Integrity***

The Company is committed to the transparency and integrity of publicly filed financial reports and other communications. Covered Persons must do their part to ensure that the Company’s public disclosure is full, fair, accurate, timely and understandable.

Always act responsibly and exercise sound judgment regarding matters involving the Company’s finances. Keep accurate, complete and timely records, and submit accurate and complete reports. Do not mislead, manipulate or improperly influence the Company’s finance team or external auditors or make any false or misleading statements or omissions in the Company’s public disclosure. Covered Persons should not personally enter into any side agreements or other informal arrangements, written or oral, related to the Company.

38. Regarding compliance with applicable laws, the Code states that:

Always follow applicable laws, rules and regulations and do not engage in any type of illegal, unethical, fraudulent or corrupt business practices for any reason. The Company expects each Covered Person to understand the legal and regulatory requirements applicable to his or her business unit and areas of responsibility.

***Insider Trading***

Covered Persons must comply with applicable insider trading laws, which generally prohibit buying or selling securities of the Company while in possession

> of material non-public information about the Company. See the Insider Trading Policy for more detail.
>
> ***Corruption and Bribery***
>
> Covered Persons must comply with all applicable anti-corruption and anti-bribery laws, including the *Canadian Corruption of Foreign Public Officials Act* and the U.S. *Foreign Corrupt Practices Act*. See the Anti-Corruption Policy for more information.

39. Upon information and belief, the Company maintained versions of the Code during the Relevant Period that imposed the same, or substantially and materially the same or similar duties on, among others, the Individual Defendants, as those set forth above.

**Control, Access, and Authority**

40. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Hut 8, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Hut 8.

41. Because of their advisory, executive, managerial, and directorial positions with Hut 8, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Hut 8.

42. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Hut 8 and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

43. To discharge their duties, the officers and directors of Hut 8 were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Hut 8 were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d) remain informed as to how Hut 8 conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e) ensure that Hut 8 was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## V. BREACHES OF DUTIES

44. Each Individual Defendant, by virtue of their position as a director and/or officer, owed to Hut 8 and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of Hut 8, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Hut 8, the absence of good faith on their part, and a reckless disregard for their duties to Hut 8 and its shareholders that the Individual Defendants were aware or should have been

aware posed a risk of serious injury to Hut 8.

45. The Individual Defendants each breached their duties of loyalty and good faith by allowing the Individual Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

46. In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Related Securities Action that alleges violations of the federal securities laws. As a result, Hut 8 has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## VI. CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

47. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

48. During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

49. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties, unjust enrichment, gross mismanagement, and abuse of control; and (b) disguise and misrepresent the

Company's actual business and financial prospects.

50. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

51. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of their overall contribution to and furtherance of the wrongdoing.

## VII. SUBSTANTIVE ALLEGATIONS

### A. Background of the Company

52. Hut 8 is a crypto currency and data mining company engaged in Bitcoin mining and hosting, managed services, energy arbitrage, and operating traditional data centers. Hut 8 operates computing infrastructure that mines Bitcoin and delivers computing services to the Company's enterprise customers. The Company was formed through a merger completed on November 30, 2023, whereby Legacy Hut merged with USBTC.

53. Prior to the merger, USBTC held assets including a 50% interest in a joint venture bitcoin mining facility, located in King Mountain, Texas, King Mountain JV.

### B. Materially False and Misleading Statements During the Relevant Period

54. The Relevant Period beings on November 9, 2023, when the Company filed a Form

424B3 with the SEC, which is part of the Merger Prospectus (the "Prospectus"). The Prospectus described USBTC, stating:[4]

> USBTC has several revenue streams: self-mining, hosting, managed infrastructure operations and equipment sales. Self-mining refers to all USBTC-owned machines that contribute computing power to mining pools in exchange for Bitcoin. Hosting refers to USBTC operating third party-owned machines at its sites in exchange for a hosting fee. Managed infrastructure operations refers to USBTC operating third-party-owned Bitcoin mining sites, leveraging its purpose-built site management software along with the curtailment platform, in exchange for a property management fee. Equipment sales refers to USBTC selling mining or infrastructure equipment to third-parties.
>
> USBTC owns and operates a Bitcoin mining facility in Niagara Falls, New York with access to approximately 50 MW of electricity (the "Alpha Site"). In December 2022, USBTC acquired from Compute North Member LLC ("CN Member") their entire membership interest in TZRC LLC, representing 50% of all issued and outstanding membership interests in the King Mountain JV with NextEra. The King Mountain JV owns a Bitcoin mining site in Upton County, Texas with access to approximately 280 MW of electricity (the "Echo Site"). The Echo Site is co-located behind-the-meter at a wind farm.

55. The Prospectus describes the energy outpoint available pursuant to the Merger:

> Renewable energy sources powering USBTC's owned and operated sites include renewable energy and zero carbon emission energy from wind, hydro, and nuclear sources. As of June 30, 2023:
>
> - Alpha Site at Niagara Falls is fueled by a minimum of approximately 91% zero carbon emission energy sources;
> - Charlie Site in Nebraska is powered by more than 56% zero carbon emission sources, including 42.3% nuclear, 7.4% wind and 6.4% hydro; and
> - The Echo facility at King Mountain is co-located behind the meter at a wind farm, and at peak wind generation periods can draw up to 100% of the energy the wind project produces to power mining and hosting; the rest of the time, the energy is sourced from ERCOT which includes more than 40% zero carbon emission sources.

56. The Prospectus purported to warn of the risks of a loss of internet connectivity:

> ***USBTC may face risks of Internet disruptions, which could have an adverse effect on the price of Bitcoin***.

[4] All emphasis has been added unless otherwise indicated.

> A disruption of the Internet may affect the use of Bitcoin and subsequently the value of USBTC's securities. Generally, Bitcoin and USBTC's business of mining digital assets is dependent upon the Internet. A significant disruption in Internet connectivity could disrupt a currency's network operations until the disruption is resolved and have an adverse effect on the price of Bitcoin and USBTC's ability to contribute computing power to pools that mine Bitcoin.

57. The Prospectus reported selected historical consolidated financial data of USBTC, including revenue of $82.16 million and a net loss of $66.611 million, or $1.52 per share.

58. On December 11, 2023, Hut 8 announced an Operations Update for November 2023 via press release, which reported that the Company had, as of that date: 839 Megawatts total energy capacity under management, 207,399 total deployed miners under management, 75,078 Deployed miners self-mining, 166,775 deployed miners under management for managed services, and 76,737 deployed miners under management for hosting.

59. On December 19, 2023, the Company submitted its financial results on Form 10-Q for the quarterly period ended September 30, 2023 (the "3Q23 10-Q"). The 3Q23 10-Q contained the following summary of USBTC and King Mountain JV:

> **King Mountain JV**
>
> On December 6, 2022, one of USBTC's subsidiaries acquired a 50% membership interest in the King Mountain JV and assumed the King Mountain JV's senior Note (the "King Mountain JV Senior Note"). USBTC acquired the 50% membership interest through a competitive auction process in connection with the Chapter 11 bankruptcy filing of Compute North. ***The King Mountain JV has self-mining and hosting operations at the King Mountain location. USBTC has concluded that the King Mountain JV will be accounted for with the equity method of accounting***. USBTC's 50% portion of monthly distributions from the King Mountain JV will be swept to pay down the King Mountain JV Senior Note. For additional information on the King Mountain JV Senior Note, see below.
>
> Self-mining revenue, hosting services revenue and cost reimbursement revenues for the King Mountain JV was $6.7 million, $13.3 million and $12.3 million, respectively, for the three months ended September 30, 2023, which represented 100% of the King Mountain JV's revenue during the period.

60. In addition, concerning related party transactions, the 3Q23 10-Q stated:

Related parties are defined as entities related to the Company's directors or main shareholders as well as equity method investment entities. ***The Company provides services to TZRC, an equity method investment entity*** (refer to Note 9 for additional information on the equity method investment entity), in exchange for fees under a PMA.

61. The 3Q23 10-Q reported income derived from King Mountain JV:

**U.S. Data Mining Group, Inc. and Subsidiaries**
**Notes to Unaudited Condensed Consolidated Financial Statements**

A summarized consolidated income statement and balance sheet for TZRC as of September 30, 2023 follows:

Condensed Consolidated Income Statement

| | Three Months Ended September 30, 2023 |
|---|---|
| Revenues, net | $ 32,279 |
| Gross profit | $ 17,305 |
| Net income | $ 665 |
| Net income attributable to investee | $ 303 |

Condensed Consolidated Balance Sheet

| | As of September 30, 2023 |
|---|---|
| Cash | $ 29,300 |
| Current assets | $ 41,022 |
| Noncurrent assets | $ 202,764 |
| Current liabilities | $ 26,371 |
| Noncurrent liabilities | $ 15,651 |
| Members' equity | $ 201,764 |

**Note 10. Notes Payable**

The following is a summary of the Company's secured promissory notes as of September 30, 2023 and June 30, 2023:

**Notes Payable – September 30, 2023:**

| Issuance Date | Maturity Date | Interest Rate | Principal * | Current Portion |
|---|---|---|---|---|
| ***Anchorage Loan*** | | | | |
| February 3, 2023 | February 2, 2028 | 14.00 % | $ 46,555 | $ 985 |
| | | | | |
| ***TZRC Secured Promissory Note*** | | | | |
| December 6, 2022 | April 8, 2027 | 15.25 % | 84,292 | — |
| | | | | |
| ***Third Party Note*** | | | | |
| December 6, 2022 | December 5, 2027 | 18.0 % | 10,985 | — |
| | | Totals | $ 141,832 | $ 985 |

* = Net of debt issuance costs which totaled approximately $3.7 million.

**Notes Payable – June 30, 2023:**

| Issuance Date | Maturity Date | Interest Rate | Principal * | Current Portion |
|---|---|---|---|---|
| ***Anchorage Loan*** | | | | |
| February 3, 2023 | February 2, 2028 | 14.00 % | $ 48,587 | $ 1,299 |
| | | | | |
| ***TZRC Secured Promissory Note*** | | | | |
| December 6, 2022 | April 8, 2027 | 15.25 % | 92,102 | — |

62. On January 5, 2024, the Company announced an Operations Update for December 2023 via press release which stated in relevant part, that the Company held, as of December 2023:

839 Megawatts total energy capacity under management, 205,759 total deployed miners under management, 73,943 Deployed miners self-mining, 166,347 deployed miners under management for managed services, and 76,734 deployed miners under management for hosting.

63. The above statements were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that one of USBTC's largest shareholders is an undisclosed related party; (2) that USBTC's core asset has historically failed to provide energy and high-speed internet; (3) that the profitability of certain USBTC assets were overstated; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

### C. The Truth Emerges

64. On January 18, 2024, J Capital Research published a report entitled "The Coming HUT Pump and Dump" (the "Report"). The Report alleged that USBTC's CEO, Defendant Ho, may be hiding ownership shares through his partner, Anna Kudrjasova ("Kudrjasova"), via her company Anaya Capital Corp.:

> Documents for different companies list the same address for Ho and Kudrjasova, in Dubai at 5709 Cayan Tower, Dubai Marina, Dubai, UAE 643671.
>
> > "(31) Anna Kudrjasova has sole voting and dispositive power over the securities held for the account of this selling stockholder, as director. **The selling stockholder's address is 5709 Cayan Tower, Dubai Marina, Dubai, UAE 643671.**"
> >
> > "21 The address that Michael Ho gave as President, Secretary, and Treasurer of both Kairos and Ingenium Global Inc. – **5709 Cayan Tower in Dubai** – is different from the address he gave to the State of Florida in registering Prive."
>
> The Hut 8 S-4 acknowledges that Kudrjasova lives in Dubai but lists her address as 1202, Al Barsha Heights, Teacom, Dubai Marina, Dubai, United Arab Emirates, a

> hotel and managed apartment property. Michael Ho's location is given as Dubai but without a street address. This suggests to us that Hut 8 management may be hiding the nature of their relationship.

(Emphasis in original.)

65. Additionally, the Report describes the significance of this allegation, "because Ho has committed to a lock-up of 65% of his shares – but not hers. Anaya Capital appears to hold about 3.7 mln shares." The Report further states that Defendant Ho and Kudrjasova have been associated for nearly a decade:

> The two have been associated for about a decade. Back in 2014, the Vancouver Sun identified Ho and Kudrjasova as a couple.
>
> *HO A GO-GO: Folks filled a 3,000-square-foot, Boundary-at-Kitchen showroom recently at a debut party for Shanghai-born Michael Ho's Vancouver Motorcars firm. Pushed outside were Ferraris, sporty Audis and Ho's Mercedes-Benz SLR 6.3 on which he must pay a hefty insurance premium. That's because, like Latvia-born personal and business partner Anna Kudrjasova, he is 20 years old but already a seasoned entrepreneur. The two sold their Ritzypin online womenswear firm recently when, despite satisfactory sales margins, local manufacturing was barely profitable.*
>
> "

66. The Report also alleged that King Mountain JV "has historically failed to provide energy and high-speed internet," and described an extensive history of a lack of connectivity, despite the fact Bitcoin mining requires constant connectivity:

> ***The King Mountain JV has been plagued with connectivity problems***. In its 2023 Annual Report, published on March 16, 2023, MARA reported "the company experienced significant production downtime in the second and third quarters . . . and delays in energization at King Mountain." MARA had 60,000 miners at the facility, but according to a Proof of Claim MARA filed in the Compute North bankruptcy case, the miners were never energized. MARA's Statement of Claim said that King Mountain lacked a high-speed internet connection.
>
> * * *
>
> On November 23, 2022, ***MARA, which was the largest customer for the King Mountain site, filed a motion stating that Compute North at King Mountain had failed to energize its miners and failed to provide an adequate internet connection***.

* * *

MARA also said that there was a ***lack of high-speed connection at the facility***.

* * *

***USBTC itself was so disgruntled that it filed suit. Just one month before buying the King Mountain JV, USBTC filed an action against CN King Mountain LLC for failing to find a location where miners could be installed and energized***.

* * *

Our diligence suggests that the facility now uses a Starlink satellite network instead of a broad- band connection to access the internet. This is unheard of in the Bitcoin mining industry. Starlink is an expensive and unreliable choice for mining at scale. Said one interviewee who managed a large data center when asked if he would ever use Starlink as primary internet source for Bitcoin mining at scale, he said "never."

67. The Report also alleged that the Company overstates profitability by failing to account for certain "interest expenses" concerning King Mountain JV:

The company is misleading on the profitability of the JV, with accounts showing $665,000 of profit while completely ignoring about the $3.2 mln interest expense incurred during the same period.

**U.S. Data Mining Group, Inc. and Subsidiaries**
**Notes to Unaudited Condensed Consolidated Financial Statements**

A summarized consolidated income statement and balance sheet for TZRC as of September 30, 2023 follows:

Condensed Consolidated Income Statement

**An apparently, albeit barely, profitable JV seems like good news**

| | Three Months Ended September 30, 2023 |
|---|---|
| Revenues, net | $ 32,279 |
| Gross profit | $ 17,305 |
| Net income | $ 665 |
| Net income attributable to investee | $ 303 |

**Note 10. Notes Payable**

The following is a summary of the Company's secured promissory notes as of September 30, 2023 and June 30, 2023:

<u>Notes Payable – September 30, 2023:</u>

**Yet these JV numbers exclude the very expensive interest cost from a promissory note assumed with the acquisition of the JV - this cost is shown elsewhere in the company filings**

| Issuance Date | Maturity Date | Interest Rate | Principal * | Current Portion |
|---|---|---|---|---|
| *Anchorage Loan* | | | | |
| February 3, 2023 | February 2, 2028 | 14.00 % | $ 46,555 | $ 985 |
| *TZRC Secured Promissory Note* | | | | |
| December 6, 2022 | April 8, 2027 | 15.25 % | 84,292 | — |
| *Third Party Note* | | | | |
| December 6, 2022 | December 5, 2027 | 18.0 % | 10,985 | — |
| | | Totals | $ 141,832 | $ 985 |

* = Net of debt issuance costs which totaled approximately $3.7 million.

68. The report also casted doubt on other reported financial, stating:

> We are confused about how many miners USBTC has. The November 2023 Hut 8 operations update claims that USBTC had 46,225 Bitcoin miners deployed for October 2023, and yet at the end of September 2023, USBTC reported operating only 30,200 miners.
>
> We find this ramp-up extremely unlikely, especially without disclosing new machine orders or deposits for new miners in USBTC's end September 2023 balance sheet. Remaining construction in progress was far less than the typical purchase value for that many extra machines. Is USBTC telling the truth?

69. The report further claimed that, without the merger with Hut 8, an individual "highly familiar" with USBTC stated that USBTC would have been forced to undergo a structured bankruptcy:

> One person highly familiar with USBTC told us, "without the merger, [USBTC] would have done a structured bankruptcy."
>
> * * *
>
> "The merger was a complete godsend for USBTC," someone deeply involved with the company told us. Without the merger, this person said, USBTC would have been bankrupt within weeks. "It was very much in the cards." ***In early 2023, USBTC gave up almost half its miners, plus $20.7 mln and some other assets, in an apparent default***.
>
> * * *
>
> Our interviewee said that USBTC "begged" NYDIG to forgive the loan but soon after Christ- mas was forced to surrender assets. ***Hut 8 managed to characterize this default as a $23.7 mln GAIN on debt extinguishment. But it had started out as a $24.2 mln LOSS that the company "fixed" through an accounting sleight of hand***. Abracadabra!

70. Lastly, the Report concluded, based on review of financial reports, "we estimate a value for USBTC that's as much as 70% less. Typically, such egregious over-payments occur only when management is being enriched." The Report continued:

> We are highly skeptical that the King Mountain JV is worth the $105 mln paid by USBTC, given reports that the center at the time lacked both reliable power and

internet.

Nevertheless, we assign what we believe to be an aggressive $105 mln valuation – the price USBTC paid for the facility. This is despite MARA's recent purchase of Granbury and Kearney, which indicates that the King Mountain JV would be worth only $64 mln.

Our valuation of USBTC's Managed Infrastructure Operations (MIO) business is $51 mln, a generous 3x forward revenue.

* * *

***In total, we value the USBTC operating assets at the high end at $219 mln. Not only do we suspect that USBTC overpaid for the King Mountain JV, but Hut 8 overpaid again, by a factor of four, for the same facility, along with the Niagara mining facility and the two managed-facility contracts***. New Hut issued 49.7 mln shares in exchange for all US- BTC stock – a value of about $495 mln at the time. Hut 8 also took on $160 mln in net debt plus around $90 mln in planned spending commitments ($40 mln for AI equipment and $50 mln in planned capital expenditure) in exchange for the USBTC and Legacy Hut assets.

71. Following this news, the Company's stock price fell $2.16, or 23.3%, closing at $7.13 per share on January 18, 2024.

72. As a result of Defendants' wrongful acts and omissions, and the precipitous declines in the market value of the Company's securities, the Company and its shareholders have been damaged.

## VIII. DAMAGES TO THE COMPANY

73. The Company has been, and will continue to be, severely damaged and injured by the Defendants' misconduct. As a direct and proximate result of the Defendants' conduct, the Company has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

a. costs incurred in compensation and benefits paid to Defendants that breached their fiduciary duties and violated federal securities laws;

b. substantial loss of market capital;

c. costs already incurred and to be incurred defending the Related Securities Action; and

d. any fines or other liability resulting from the Company's violations of federal law.

74. In addition, Hut 8's business, goodwill and reputation with its business partners, regulators and shareholders have been gravely impaired. The credibility and motives of management are now in serious doubt.

75. The wrongdoing complained of herein has irreparably damaged Hut 8's corporate image and goodwill. For at least the foreseeable future, Hut 8 will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Hut 8's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## IX. DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

76. Plaintiff brings this action derivatively in the right and for the benefit of Hut 8 to redress injuries suffered, and to be suffered, by Hut 8 as a direct result of violations of federal securities laws by the Defendants. Hut 8 is named as a Nominal Defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

77. The Board of Hut 8, at the time this action was commenced, consisted of Defendants Tai, Ho, Genoot, Hefti, Flinn, Shattuck, O'Neal, Wilkinson, and Rickertsen, a total of nine (9) individuals. As such, Plaintiff is only required to show that five of the Company's directors cannot exercise independent objective judgment as to whether to bring this action.

78. Plaintiff has not made any demand on the Board to institute this action because a

pre-suit demand on the Hut 8 Board would be futile, and therefore, excused. This is because a majority of the Board faces a substantial likelihood of liability as a result of their scheme and false and misleading statements and/or omissions of material adverse facts which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

**Demand is Futile as to Defendant Genoot Because of His**
**Principal Professional Occupation as the Company's CEO**

79. Defendant Genoot is the Company's CEO and a member of the Board. The Company does not claim that Defendant Genoot is an independent director and because his primary source of income and primary employment is his employment as CEO of Hut 8 and his professional reputation is inextricably bound to his role at Hut 8. Defendant Genoot is incapable of acting independently and demand is futile upon him.

**Demand is Futile as to Defendant Ho Because of His**
**Principal Professional Occupation as the Company's CEO**

80. Defendant Ho is the Company's CSO and a member of the Board. The Company does not claim that Defendant Ho is an independent director and because his primary source of income and primary employment is his employment as CSO of Hut 8 and his professional reputation is inextricably bound to his role at Hut 8. Defendant Ho is incapable of acting independently and demand is futile upon him.

**Demand is Futile as to the Members of the Audit Committee**

81. Demand is futile as to Defendants Flinn, O'Neal, and Shattuck (the "Audit Committee Defendants") as members of the Audit Committee during the Relevant Period for their knowing failure to fulfill their responsibilities.

82. The Board adopted an Audit Committee Charter, setting forth the responsibilities of the Audit Committee. The duties and purpose of the Audit Committee are set forth *supra*.

83. Upon information and belief, in their capacity as members of the Audit Committee, the Audit Committee Defendants were privy to specific information related to the Company's business, operations, and prospects, which would reasonably put them on notice that the statements set forth above in the Company's public filings were materially false and misleading when made.

84. The Company's public filings concerning the Company's business and prospects during the Relevant Period contained materially misleading information and/or omitted material information. In their capacity as members of the Audit Committee, the Audit Committee Defendants were charged with ensuring that these reports did not contain such materially misleading information. By allowing documents to be filled with misleading information, the Audit Committee Defendants face a sufficiently significant likelihood of liability so as to render them interested. Accordingly, the Audit Committee Defendants cannot adequately independently consider a demand.

**Demand is Futile as to the Director Defendants**

85. Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Company's Board would be futile, and therefore, excused. This is because a majority of the Board faces a substantial likelihood of liability as a result of their knowing toleration of the above described false and misleading statements and omissions of material adverse facts, which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

86. Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

87. Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period. By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

88. Accordingly, the Director Defendants face a sufficiently substantial likelihood of liability such as to create a reasonable doubt as to their impartiality to consider a demand to sue themselves in the present action.

**COUNT I**

**Against the Securities Action Defendants for Contribution Under Section 10(b) of the Exchange Act, Rule 10b-5 Promulgated Thereunder, and/or Section 20(a) of the Exchange Act**

89. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

90. As a result of the conduct and events alleged above, Hut 8 has been named as a defendant in the Related Securities Action brought on behalf of Hut 8 shareholders in which it is a joint tortfeasor in claims brought under Section 10(b) of the Securities and Exchange Act and Rule 10(b)-5 promulgated thereunder.

91. Federal law provides Hut 8 with a cause of action against other alleged joint tortfeasors under Rule 10b-5. In particular, under the Supreme Court's decision in *Musick, Peeler & Garrett v. Employers Insurance of Wausau*, 508 U. S. 286, Hut 8 has a federal law right of contribution against joint tortfeasors under Rule 10b-5. Section 21D(f) of the Securities and Exchange Act further sets forth specific provisions entitling Hut 8 to contribution against all joint

tortfeasors under Rule 10b-5, regardless of whether they have been named as defendants in the currently pending Related Securities Action, and sets forth specific rules regarding the determination of claims for such contribution.

92. Accordingly, Plaintiff, on behalf of Hut 8, hereby claims contribution against the Securities Action Defendants, each of whom has been named in the currently pending Related Securities Action as a joint tortfeasor with Hut 8 under Rule 10b-5, or if joined in such actions, would be liable for the same damages as Hut 8.

93. Hut 8 claims no right to indemnification under the federal securities laws from them in this count, but rather only claims contribution.

**Allegations Regarding the Securities Action Defendants**

94. Throughout the Relevant Period, the Securities Action Defendants caused the Company to issue false and misleading statements and/or omit material information in public statements and/or Company filings concerning the Company's business and financial prospects. These statements were materially misleading to persons who purchased Hut 8 securities during the Relevant Period.

95. The plaintiffs in the Related Securities Action allege that they relied, directly or indirectly, upon these false statements and misleadingly omissive disclosures in purchasing Hut 8 securities, and, as a result, suffered damages because value of their investments was distorted by the false and materially omissive statements, and they purchased such securities at such distorted prices.

96. The damages suffered by said investors were caused by reason of the fact that (i) they were induced to purchase said securities by the false and misleading statements alleged herein, and (ii) the reveal of the true nature of the Company's business and prospects resulted in the

decrease in price of its securities, causing the value of shareholders investments to drop.

97. The plaintiffs in the Related Securities Action were unaware of the false and misleading nature of said statements and omissive disclosures.

98. When the Securities Action Defendants signed off on or made the false statements and omissive disclosures detailed herein, they had actual knowledge that they were false and misleading. As alleged in detail herein, due to their positions as employees and/or directors of Hut 8, the Securities Action Defendants were privy to information regarding the Company's business and financial prospects and would have been aware that the statements made were in fact false and misleading when made.

99. Accordingly, the Securities Action Defendants are liable for damages under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and, if Hut 8 were to be held liable in the Related Securities Action, the Securities Action Defendants would be liable to it for contribution. Plaintiffs hereby derivatively claim such right of contribution on behalf of Hut 8.

**Allegations Regarding the Securities Action Defendants as Control Persons**

100. In acting as alleged above, the Securities Action Defendants were acting as authorized agents of Hut 8 in their roles as directors and/or employees. Because of their positions of control and authority as senior officers and/or directors, the Securities Action Defendants were able to, and did, control the contents of the various reports, press releases and public filings disseminated by the Company throughout the Relevant Period, as alleged herein.

101. The Securities Action Defendants were "controlling persons" of Hut 8 within the meaning of Section 20(a) of the Exchange Act, and, accordingly, the Securities Action Defendants could be held liable to the plaintiffs in the Related Securities Action. Were the Company to be held liable in said Related Securities Action, the Securities Action Defendants would be liable to

it for contribution.

102. Plaintiff hereby derivatively claims such right of contribution on behalf of Hut 8.

**COUNT II**

**Against the Individual Defendants for Breaches of Fiduciary Duty**

103. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

104. The Individual Defendants owed and owe Hut 8 fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Hut 8 the highest obligation of good faith, loyalty, and due care.

105. The Individual Defendants have violated and breached their fiduciary duties of good faith, loyalty, and due care by causing or allowing the Company to disseminate to Hut 8 shareholders materially misleading and inaccurate information through the Company's SEC filings throughout the Relevant Period. These actions could not have been a good faith exercise of prudent business judgment.

106. During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused Hut 8 to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties owed to Hut 8 and its shareholders. As a result, the Individual Defendants grossly mismanaged the Company.

107. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

108. Plaintiff, on behalf of Hut 8, has no adequate remedy at law.

**COUNT III**

**Against the Individual Defendants for Unjust Enrichment**

109. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

110. By his wrongful acts and omissions, the Securities Action Defendants were unjustly enriched at the expense of and to the detriment of Hut 8.

111. The Securities Action Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Hut 8.

112. Plaintiff, as a shareholder and representative of Hut 8, seeks restitution from the Securities Action Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Securities Action Defendants from their wrongful conduct and breaches of fiduciary duty.

113. Plaintiff, on behalf of Hut 8, has no adequate remedy at law.

**COUNT IV**

**Against the Individual Defendants for Waste of Corporate Assets**

114. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

115. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

116. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, among other things: (a) paying excessive compensation and bonuses to certain

executive officers; (b) awarding self-interested stock options to certain officers and directors; and (c) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Related Securities Action.

117. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

118. Plaintiff, on behalf of the Company, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

A. Declaring that Plaintiff may maintain this action on behalf of Hut 8 and that Plaintiff is an adequate representative of the Company;

B. Determining and awarding to Hut 8 the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

C. Directing Hut 8 and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Hut 8 and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

(1) a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and

guidelines of the Board; and

(2) a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

D. Determining and awarding to Hut 8 exemplary damages in an amount necessary to punish Defendants and to make an example of Defendants to the community according to proof at trial;

E. Awarding Hut 8 restitution from Defendants, and each of them;

F. Awarding Hut 8 Contribution from the Securities Action Defendants, and each of them;

G. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H. Granting such other and further equitable relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: April 19, 2024

Respectfully submitted,

By: */s/ Joshua M. Lifshitz*

Joshua M. Lifshitz
**LIFSHITZ LAW PLLC**
1190 Broadway
Hewlett, New York 11557
Telephone: (516) 493-9780
Facsimile: (516) 280-7376

*Attorneys for Plaintiff*

**VERIFICATION**

I, Maghar Ubhi hereby declare as follows:

I am shareholder of HUT and have continuously so owned the Company's common stock during the relevant period. I declare that I am the plaintiff named in the foregoing Shareholder Derivative Complaint ("Complaint"), and know the content thereof; that the pleading is true to my knowledge, except as to those matters stated on information and belief, and that as to such matters I believe to be true. I declare under penalty of perjury that the foregoing is true and correct.

Executed on 04/18/2024



Signature